CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
Callie Glanton Steele (Bar No. 155442)
(E-Mail:  callie_steele@fd.org)
Senior Litigator
Dinah M. Manning (D.C. Bar No. 1023795, CA *pending*)
(E-Mail:  dinah_manning@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
JORDAN WAYNE HOLT

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | Case No. CR 21-205-JFH |
|---|---|
| Plaintiff, | **OPPOSITION TO THE GOVERNMENT'S NOTICE OF EXPERT AND MOTION TO EXCLUDE THE TESTIMONY OF AGENT BRAD KNIGHT AND BARBARA WELLS** |
| v. | |
| JORDAN WAYNE HOLT, | |
| Defendant. | |

Defendant, Jordan Holt, by and through his counsel of record, Senior Litigator Callie Glanton Steele and Deputy Federal Public Defender Dinah M. Manning, hereby moves to exclude the testimony of Agent Brad Knight and Barbara Wells at trial.  This motion is based on Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), *Kumho Tire v. Carmichael, 526 U.S. 137* (1999), the attached

//

//

//

memorandum of points and authorities, all files and records in this case, and any further evidence as may be adduced at the hearing on this motion.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 1, 2022          By   */s/ Dinah M. Manning*
_____
CALLIE GLANTON STEELE
Senior Litigator
DINAH M. MANNING
Deputy Federal Public Defender
Attorneys for Jordan Wayne Holt

2

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I. STATEMENT OF FACTS ............................................................................................................ 2

II. ARGUMENT ................................................................................................................................ 3

    A.    THE GOVERNMENT'S EXPERT TESTIMONY MUST BE EXCLUDED PURSUANT TO RULE 16(a)(1)(G) BECAUSE OF DEFECTIVE NOTICE. ......................................................................................... 3

        1.    The government's notice related to Special Agent Brad Knight is generic, non-specific, and non-compliant with Rule 16. .............. 4

        2.    The government's notice related to Barbara Wells is generic, non-specific, and non-compliant with Rule 16 ............................... 7

    B.    THE GOVERNMENT'S EXPERT TESTIMONY MUST BE EXCLUDED PURSUANT TO *DAUBERT*. ................................................. 8

        1.    *Daubert* and FRE 702 Standard ......................................................... 9

            a.    Rule 702 and *Daubert* require rigorous evaluation of the reliability of particular methodologies and how they are applied. .......................................................................................... 9

               (1)    Special Agent Brad Knight ........................................ 12

               (2)    Barbara Wells ............................................................. 13

        2.    Qualifications Alone Do Not Make Expert Opinion Testimony Admissible ........................................................................................... 15

III. CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*,
  565 F.3d 769 (10th Cir. 2009) ........................................................ 14, 15

*United States v. Crisp*,
  324 F.3d 261,268 (4th Cir. 2003) ............................................................ 11

*Daubert. United States v. Rodriguez-Felix*,
  450 F.3d 1117 (10th Cir. 2006) ............................................................... 11

*Daubert v. Merrell Dow Pharmaceuticals*,
  505 U.S. 579 (1993) ................................................................... 2, 9, 11

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) ................................................................. 9, 10, 12

*United States v. Fredette*,
  315 F.3d 1235 (10th Cir. 2003) ............................................................... 11

*United States v. Fultz*,
  591 Fed. Appx. 226 (4th Cir. 2015) ......................................................... 11

*United States v. Goxcon-Chagal*,
  886 F. Supp. 2d 1222 (D.N.M. 2012) ........................................................ 4

*United States v. Gutierrez-Castro*,
  805 F. Supp. 2d 1218 (D.N.M. 2011) ........................................................ 4

*United States v. Hassan*,
  742 F.3d 104 (4th Cir. 2014) ................................................................ 10

*In re James Wilson Assocs.*,
  965 F.2d 160 (7th Cir. 1992) ................................................................. 6

*United States v. Johnson*,
  587 F.3d 625 (4th Cir. 2009) ................................................................. 6

*Kumho Tire v. Carmichael*,
  *526 U.S. 137 (1999)* ......................................................................... 10

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) ................................................................. 6

# **TABLE OF AUTHORITIES**

Page(s)

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
   420 F. Supp. 2d 1070 (N.D. Cal. 2006) ........................................................................ 6

*United States v. Rodriguez*,
   125 F. Supp. 3d 1216 (D.N.M. 2015) .................................................................... 4, 5

**Federal Statutes**

18 U.S.C. §§ 113(a)(1), 1151 ........................................................................................ 1

18 U.S.C. §§ 113(a)(1), 1153 ........................................................................................ 1

18 U.S.C. § 924 ............................................................................................................. 1

18 U.S.C. §§ 1111(a), 1151 .......................................................................................... 1

18 U.S.C. §§ 1112(a), 1153 .......................................................................................... 1

128 U.S.C. § 2461(c) .................................................................................................... 1

**Federal Rules**

Fed. R. Crim. P. 16 ..............................................................................................*passim*

Fed. R. Evid. 702 ................................................................................................*passim*

Fed. R. Evid. 703 ................................................................................................... 2, 6

## MEMORANDUM OF POINTS AND AUTHORITIES

In a Superseding Indictment, Jordan Holt is charged with first degree murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153 [Count 1]; second degree murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153; first degree murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153 [Second Degree]; Voluntary Manslaughter in in Indian Country, in violation of 18 U.S.C. §§ 1112(a), 1151, and 1153 [Count 3]; use, carry, brandish, and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i)(ii)(iii) [Count 4]; causing the death of a person in the course of a violation of 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j)(1) and (2) [Count 5]; assault with intent to commit murder in Indian Country, in violation of 18 U.S.C. §§ 113(a)(1), 1151 and 1153 [Count 6]; assault with a dangerous weapon in Indian Country, in violation of 18 U.S.C. §§ 113(a)(1), 1151, and 1153 [Count 7]; use, carry, brandish, and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i)(ii)(iii) [Count 8]; and he has also been charged with a forfeiture allegation, 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).  Trial in this matter is currently scheduled for March 1, 2022.

The offense in this matter occurred on August 1, 2019.  The federal complaint was filed on April 15, 2021.  Yet, seven weeks before Mr. Holt's March 1, 2022 trial date, the government filed a notice of its intent to call several proposed experts to testify about varying topics of scientific and technical expertise.  In its notice the government makes reference to discovery provided as late as January 12, 2022.  *See* Docket Entry 42, "Notice of Intent to Offer Expert Witness Testimony."  The government takes the position that the notice filed on January 14, 2022, satisfies its obligations pursuant to Federal Rule 16(a)(1)(G).  *Id*.

1

Through this motion, the defense moves this Court to exclude the testimony of Brad Knight and Barbara Wells. The government should not be permitted to offer the expert testimony of Brad Knight and Barbara Wells for two reasons: (1) the government has not provided sufficient notice as required by Fed. R. Evid. 16, and (2) the government has failed to satisfy the requirements of Fed. R. Evid. 702, 703, and *Daubert v. Merrell Dow Pharmaceuticals*, 505 U.S. 579 (1993). Indeed, there is insufficient information to determine whether the proffered experts can be qualified to testify about the topics at issue in this case.

For these reasons, the defense asks that the Court exclude the purported testimony of Brad Knight and Barbara Wells.

## I.   STATEMENT OF FACTS

On April 26, 2021, the defense provided government counsel with a written discovery request. Contained therein was a specific request relating to scientific analyses and tests and expert testimony:

> 8. All (a) scientific analyses or tests conducted in the case. This request includes, but is not limited to, forensic, fingerprint, chemical and handwriting analyses, as well as all underlying data pertaining to all analyses or tests; (b) all examination or lab notes, and similar materials, regarding any analyses or tests relating to this matter; and (c) access to all testing devices, machines and/or other implements used by any governmental agents (including those acting at their direction) with respect to any scientific analyses or tests pertaining to this case.

> 9. The conclusions and findings of any expert witness you intend to call, whether or not such expert has prepared a written report, and all disclosures required by Rule 16 of the Federal Rules of Criminal Procedure. *United States v. Barrett*, 703 F.2d 1076 (9th Cir. 1983). As required by Rule 16, please provide me with a written summary of all testimony that you intend to introduce pursuant to Federal Rules of Evidence 702, 703, and 705.

2

On January 12, 2022, the government, for the first time, provided the defense with Agent Brad Knight's curriculum vitae and a report authored by Agent Knight on December 29, 2021, two and one-half years after the shooting incident in this case. (Bates Nos. 1921-1925); *See* Exhibit A. The government had previously provided an Oklahoma Bureau of Investigations ("OSBI") report and diagram from Agent Knight on May 25, 2021.

On January 14, 2022, the government filed its Notice of Intent to Offer Expert Witness Testimony. *See* Dkt. 42. The government's filing makes cursory assertions of topics that the experts will discuss but with no specificity and with no written summary of each proposed expert's opinion.

## II.   ARGUMENT

## A.   THE GOVERNMENT'S EXPERT TESTIMONY MUST BE EXCLUDED PURSUANT TO RULE 16(a)(1)(G) BECAUSE OF DEFECTIVE NOTICE.

Rule 16(a)(1)(G) provides:

> Expert Witnesses. At the defendant's request, the government must give to the defendant a written summary of any expert testimony that the government intends to use during its case-in-chief at trial. If the government requests discovery under Rule 16(b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of expert testimony that the government intends to use as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

The disclosure must reasonably put the defense on notice of the expert the government intends to call so that it may investigate and adequately prepare informed questions for cross-examination. The information provided by the government in this case fails to do that and therefore must

be excluded.  The government's purported notice is generic, non-specific, and non-compliant with Rule 16 for each of its purported experts.

Courts in the Tenth Circuit have approvingly quoted Professor James Moore's statement that "It is not clear how much detail must be provided [in a summary] to satisfy" the requirements that it describe the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications". *United States v. Rodriguez,* 125 F. Supp. 3d 1216, 1253 (D.N.M. 2015); *United States v. Gutierrez-Castro,* 805 F. Supp. 2d 1218, 1227 (D.N.M. 2011). Lacking clarity, the Tenth Circuit District Court in *Rodriguez*, *Gutierrez-Castro*, and *Goxcon-Chagal*, turned to the Seventh Circuit for guidance. *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1254 (D.N.M. 2012).  The United States Court of Appeals for the Seventh Circuit found that Rule 16(a)(1)(g) was *barely satisfied* when the prosecution summarized upcoming expert testimony by saying: "In response to your Request for Written Summary …, please be advised that [several named police] officers may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.  In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics.  Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations." *Rodriguez* ,125 F.Supp.3d at 1253.

> **1.   The government's notice related to Special Agent Brad Knight is generic, non-specific, and non-compliant with Rule 16.**

The government indicates that:

> "OSBI Special Agent Knight reviewed and processed the crime scene.   Agent Knight will testify to his

4

expertise in crime scene investigation, shooting reconstruction/trajectories, and firearms. Specifically, based on his education, training and experience, Agent Knight will explain his findings and opinions in his reports provided to the Defendant in discovery. (Bates Nos. 75-84; 1921-1925)."

See Dkt. 42.

The notice makes blanket references to Special Agent Knight's "findings and opinions." However, the government's notice does not even purport to offer an opinion by Agent Knight. Instead, it simply lists several topics about which he may testify, without articulating the opinion or the *bases* and *reasons* for that opinion. The proffer is a list of topics that fails to summarize the expert's expected testimony, fails to describe the expert's actual opinions, and fails to describe the bases for those opinions.

The government's notice of Special Agent Brad Knight's testimony in the present case is less specific and informative than the notice which was referred to as barely sufficient in *Rodriguez*. *Rodriguez,* 125 F.Supp.3d at 1253. The notice cited as barely sufficient in *Rodriguez* stated at a minimum that officers will testify to opinions related to the habits of narcotic traffickers. *Id*. The notice in the present case fails to even do that, instead making no mention of any positive opinion to which Agent Knight will testify.

Cursory reference to "reports" does not provide the defense with notice of the actual basis of the expert's opinion. The reports provided in Bates Nos. 75-84 read as a recitation of facts instead of an opinion by the Special Agent. The reports indicate that other officers were already on scene when Agent Knight arrived and that officers, including Agent Jim Skelton, had already commenced the processing of the crime scene and Agent Skelton

5

continued to process the scene after Agent Knight's arrival.  Further, Idabel Police Department had marked evidenced at the crime scene prior to either agents' arrival. While the report includes a diagram created by Agent Knight, it has no information about Agent Knight's opinion or the bases or reasons for those opinions.  It also presumably includes the statements and hearsay from the other officers.

Federal Rule of Evidence 703 permits an expert witness to rely on hearsay and testimonial statements to reach his or her conclusions, so long as experts in his or her particular field would "reasonably rely on those kinds of facts or data" to form an opinion.  The expert may only do so, however, if he or she is relying on those otherwise inadmissible statements to reach an independent judgment using his specialized training and experience.  *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009).  In addition, experts may adopt another expert's data only after "verifying the validity and reliability of that data." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088 (N.D. Cal. 2006).  An expert witness cannot be "used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation."  *Id.*  (4th Cir. 2009).  *See also In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) (rejecting proposed testimony of an architect that would merely repeat conclusions from an engineer's report).  "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the Government to circumvent the rules prohibiting hearsay." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quotations omitted).

Finally, the government's own notice lists Agent Knight's expertise in crime scene investigation, shooting reconstruction/trajectories, and firearms.  The government's own notice does not offer Agent Knight as an

6

expert in forensic pathology, biology or any other related field.  Yet, the OSBI report authored by Agent Knight includes extensive discussion of forensic pathology topics that are beyond Special Agent Knights purported expertise and training.  This is discussed further in Section B of this motion.  However, the defense has no information about whether Special Agent Knight possesses the requisite knowledge or experience necessary to testify as an expert and opine about the topics included in the OSBI report authored by Agent Knight on December 29, 2021. (Bates Nos. 1921-1925).  For all the reasons stated above, individually and collectively, the Court should exclude Agent Knight's testimony.

**2.    The government's notice related to Barbara Wells is generic, non-specific, and non-compliant with Rule 16.**

The government indicates that:

> Barbara Wells, Criminalist, OSBI. Ms. Wells will testify to her expertise in forensic biology, DNA collection, analysis, interpretation, typing and her statistical analysis connected to DNA analysis and typing.  Her DNA analysis and findings are detailed in a report previously provided in discovery dated February 14, 2020. (Bates No. 803-805). Based on her education, training and experience, Ms. Wells will testify to her DNA analysis and forensic biology and testify to how the examinations in this case were performed. Ms. Wells will explain her findings and opinions contained in her report referenced above.

The disclosure must reasonably put the defense on notice of the expert the government intends to call so that it may investigate and adequately prepare informed questions for cross-examination.  Yet, the information provided by the government in this case fails to do that and therefore must be excluded.  The notice does not describe what Ms. Wells' opinion is or the substance of her testimony.  Referencing a report does little to provide the defense with the type of notice required by law.  As discussed *infra* Section B(1)(a)(ii), the report authored by Ms. Wells simply states that she used Polymerase Chain Reaction (PCR) using the Short Tandem Repeat (STR) GlobalFiler amplification kit to conduct DNA analysis and that her results were inconclusive.

Simply put, the government has not provided adequate notice on the issues of crime scene investigation or forensic biology and DNA.  This means that counsel cannot adequately prepare for trial or defend Mr. Holt.  Exclusion of the government's proposed experts would impart a constructive effect on the administration of justice.  The government has had ample time to provide sufficient expert notice, but has failed to do so.  Trial by ambush, particularly where the stakes are so high, is unfair.  Only exclusion will prevent prejudice to Mr. Holt and demonstrate to the government the importance of prompt, forthright disclosures.

**B.   THE GOVERNMENT'S EXPERT TESTIMONY MUST BE EXCLUDED PURSUANT TO *DAUBERT*.**

Mr. Holt has demanded the government provide expert disclosure. The  government has only provided the topics of the testimony, but has failed to provide the specific opinions proposed to be given by the proposed experts, and the *reasons* and *bases* for those opinions as required by Fed. R. Crim. P. 16(a)(G).  The defense is entitled to know the substance of the

actual opinion to be presented in this case, the reasons or bases for the opinion, and the qualifications of the witness to express that opinion.

Mr. Holt requests that the court exercise its gatekeeping function to exclude expert opinion testimony unless it is shown to be based upon sufficient data, applying reliable principles, applied reliably to the data in this case, by a qualified expert. *See Daubert*, 509 U.S. at 592–93. The notice and "reports" mentioned in the government's filing does not substitute for a statement of what opinions will be delivered in this case.

1.   ***Daubert* and FRE 702 Standard**

a.   **Rule 702 and *Daubert* require rigorous evaluation of the reliability of particular methodologies and how they are applied.**

Expert testimony is inadmissible unless it is based on a method that is both "scientifically valid" and that "properly can be applied to the facts in issue" in a particular case. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993). Thus, *Daubert* requires, as codified in the rules of evidence, both that an expert's testimony be the "product of reliable principles and methods," *and* that the expert "reliably applied the principles and methods to the facts of the case[.]" Fed. R. Evid. 702(c), (d). While the *Daubert* Court made clear that the ultimate determination of "evidentiary relevance and reliability" is a legal question to be determined by the trial judge, 509 U.S. at 589, it also made clear that evidentiary reliability in the context of forensic expert testimony is determined by the underlying method's "scientific validity." *Id*. at 594-95.

A method's "scientific validity" rests on a number of factors identified by the scientific community itself. The *Daubert* Court looked to literature

on the scientific method to offer some non-exhaustive factors that a trial judge might consider in its 702 admissibility analysis.

*Daubert* and its progeny established five factors for assessing the reliability of an expert's proffered opinions:

> (1) whether the particular scientific theory "can be (and has been) tested";
>
> (2) whether the theory "has been subjected to peer review and publication";
>
> (3) the "known or potential rate of error";
>
> (4) the "existence and maintenance of standards controlling the technique's operation"; and
>
> (5) the technique has achieved "general acceptance" in the relevant scientific or expert community.

*United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014); *see also Daubert*, 509 U.S. at 593-94. The list *is not exhaustive*: the Court retains broad latitude to use other factors to measure reliability. *See, e.g. Kumho Tire*., 526 U.S. at 152.

The *Daubert* and Rule 702 test applies not just to novel scientific evidence or to unconventional techniques, but to *all* scientific or technical methods. As the *Daubert* Court stated, a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

In *Kumho Tire v. Carmichael, 526 U.S. 137 (1999),* the Supreme Court held the *Daubert* standard to expert testimony from non-scientists. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a [court] to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert [i.e., only by the statement of the expert himself]." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999) (citing

10

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that the *Daubert* factors apply to all areas of specialized knowledge that may be the subject of expert testimony).  Further, expert witness testimony based on knowledge or experience instead of scientific evidence must include an explanation of how the expert's experience will be "reliably applied to the facts."  Failing this, expert testimony does not meet the *Daubert* reliability factor.  *United States v. Fredette,* 315 F.3d 1235, 1240 (10th Cir. 2003).

Reliability is the touchstone of admissibility under *Daubert*. *Id*. at 589; *see also United States v. Crisp*, 324 F.3d 261,268 (4th Cir. 2003). Indeed, because of the power of expert testimony to sway a jury, "it is crucial that the [trial] court conduct a careful analysis into the reliability of the expert's proposed opinion." *United States v. Fultz*, 591 Fed. Appx. 226, 227 (4th Cir. 2015).

An expert's report that does not sufficiently allow the court to determine the reasoning and methodology supporting the expert's opinion does not meet the reliability component under *Daubert. United States v. Rodriguez-Felix,* 450 F.3d 1117, 1125 (10th Cir. 2006).  Similarly, "the requirements of *Daubert* are not satisfied by casual mention of a few scientific studies which fail to demonstrate that an expert's conclusions are grounded in established research, recognized in the scientific community, or otherwise accepted as scientific knowledge." *Id*.

In applying Rule 702, a trial court must act as a gatekeeper and make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. *See Daubert*, 509 U.S. at 592–93.  The rule requires the proponent to show:

11

(1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) the testimony is based on sufficient facts or data;

(3) the testimony is the product of reliable principles and methods; and

(4) the expert has reliably applied the principles and methods to the facts of the case.

*See* FRE 702; *see also Daubert*, 509 U.S. at 592 n.10 (proponent bears the burden). Thus it is the Court's duty to serve as the gatekeeper and exclude certain expert opinions unless they are the product of reliable principles and methods. *Id.* at 589.

As discussed below, the government has failed to meet its burden regarding proposed experts Brad Knight and Barbara Wells.

### (1)  Special Agent Brad Knight

For expert testimony to be sufficiently reliable for admission, it must be "based upon sufficient facts or data," it must be the "product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." See Fed. R. Evid. 702.

The government offers Brad Knight to testify to his expertise in crime scene investigation, shooting reconstruction and trajectories, and firearms. The government has not provided sufficient information about Special Agent Knight's expected testimony. It has also failed to provide any information about whether there is any indicia of reliability undergirding Special Agent Knight's crime scene diagram and measurements. The government has failed to provide information about whether the methods Agent Knight used would be accepted by experts in the field of crime scene investigation.

12

Most disturbingly, the government disclosed an "Analysis of Shooting" OSBI report recently authored by Agent Brad Knight.  (Exhibit A) The report that, due to the government's non-specific notice, the defense is left to construe as Agent Knight's opinion, devotes most of its contents to the discussion of a bullet's entrance into the decedent's body, damage caused, and other topics suited for a qualified forensic pathologist.

The government has provided no information about whether Brad Knight is a forensic pathologist or has the technical knowledge to opine about physiological matters like entry wounds, beveling of bone, biological deformities and perforations, brain and skin trauma, and other topics outside of his alleged expertise.  The curriculum vitae for Mr. Knight certainly does not offer or describe Agent Knight's qualifications for rendering such medical opinions.

Mr. Holt is one month from trial, and yet the defense still has little information about Agent Knight's expected expert testimony, its reliability, whether it is based on trustworthy principles and methods, or any of the other requirements articulated in *Daubert*, *Kumho Tire* and Rule 702.  The defense cannot speculate as to Agent Knight's training, experience, or qualifications in the realm of crime scene investigation, generally, or forensic pathology, specifically.

The government's "notice" does not meet the standard for admissibility of expert opinion under the tests set forth by the Supreme Court in *Daubert* and *Kumho Tire Co*.  Therefore, the Court should exclude his testimony.

### (2)    Barbara Wells

The government offers Barbara Wells to testify to the DNA analysis conducted in this case.  Even if this witness's opinion was based on research using a scientifically reliable method in principle, the government has not

met its burden under Rule 702(d) of demonstrating that it is reliable as applied in this case—that is, that the proffered research can be reliably applied to the facts of this case and that the witness's particular assertions are scientifically valid as related to this case.

The government has provided a two-page report with less than a half-a-page of conclusions but with no information regarding the *Daubert* factors.  (Bates Nos. 803-805.)

The report notes that "DNA was isolated from [items] and it was characterized through the Polymerase Chain Reaction (PCR) using the Short Tandem Repeat (STR) GlobalFiler amplification kit."  There is no information about the manner in which the testing was conducted, the case file of the DNA analysis or other critical information relevant to a *Daubert* requirement inquiry.[1]

Perhaps because juries may view forensic testimony with a less-than-critical eye, the use of unreliable forensic science is one of the leading causes of wrongful convictions. *See* Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 81–88 (2008).  In Oklahoma, the Tenth Circuit upheld a district court's exclusion of expert scientific testimony when the expert used polymerase chain reaction (PCR) analysis a technique that had previously been approved by federal case law, because the expert used the technique in a "novel and untested" manner.  *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009).  The district court

---

[1] For reference, the steps in the DNA typing process typically include (1) collection of DNA from a surface (in this case, the swabbing of the rifle); (2) extraction of DNA from the swabs; (3) quantitation, or calculation of the amount of DNA extracted; (4) amplification or copying of the DNA; and (5) typing to develop any potential DNA profiles.

14

"looked to other indications of reliability, including those enumerated by the *Daubert* court, but could find none." *Id.* at 781.

The government has failed to meet the rigorous requirements of *Daubert* and Rule 702 as it relates to Barbara Wells.  Thus, the Court should exclude any expert testimony by Ms. Wells.

## 2.    Qualifications Alone Do Not Make Expert Opinion Testimony Admissible

"[B]are qualifications alone cannot establish the admissibility of scientific expert testimony." *United States v. Hermanek*, et.al., 289 F.3d 1076, 1093 (9th Cir. 2002). Therefore, the Court here should require that the government first establish that the opinions here (1) are based upon sufficient facts and data, (2) that they are the product of reliable principles and methods, and (3) that the principles and methods were applied reliably to this case. See FED. R. EVID., Rule 702.

As previously mentioned, the government has failed to provide the defense with Special Agent Knight's qualifications for rendering an opinion fit for a forensic pathologist.  The defense does not have any pertinent information regarding Special Agent Knight's education, training, technical experience or any other relevant information related to topics that are outside the scope of his purported expertise and curriculum vitae.

The government has provided Ms. Wells' curriculum vitae, but her resume alone is insufficient to qualify her as an expert.

The government has failed to meet its burden with regard to the two aforementioned proposed experts' testimony.  Simply put, the testimony of each proposed expert fails to meet the requirements.

## III.    CONCLUSION

Because the government has (1) failed to provide sufficient and timely notice and (2) failed to meet its burden regarding its proposed experts, Mr.

15

Holt respectfully requests that this Court grant this motion and exclude the expert testimony of Agent Brad Knight and Barbara Wells.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 1, 2022

By  /s/ Dinah Manning
CALLIE GLANTON STEELE
Senior Litigator
DINAH M. MANNING
Deputy Federal Public Defender
Attorneys for Jordan Wayne Holt

16

# Exhibit A

## Oklahoma State Bureau of Investigation

## *INVESTIGATIVE ACTIVITY  OSBI2019-920/50*

Report Date:  12/29/2021

| Primary Information | |
|---|---|
| Description: | **ANALYSIS OF SHOOTING SCENE** |
| Occurrence From: | **12/02/2021 00:00** |
| Occurrence To: | **01/05/2022 00:00** |
| Reporting LEO: | **KNIGHT, BRAD (SOUTHEAST REGIONAL OFFICE / OKLAHOMA STATE BUREAU OF INVESTIGATION)** |
| Backup LEO: | **SMIDDY, TRAVIS (NORTHEAST REGIONAL OFFICE / OKLAHOMA STATE BUREAU OF INVESTIGATION)** |
| Report Status: | **Approved** |
| Report Status Date: | **01/06/2022** |
| Approved By: | **CARTER, STEVEN (OKLAHOMA STATE BUREAU OF INVESTIGATION)** |

| Address #1 - LOCATION OCCURRED #1 - 3917 N 1ST AVE | |
|---|---|
| *Primary Information* | |
| Address: | **3917 N 1ST AVE, DURANT, OKLAHOMA 74701 UNITED STATES OF AMERICA** |
| REGION: | **SOUTHEAST REGION** |
| DISTRICT: | **EASTERN DISTRICT** |

| Data Challenge |
|---|

| Narrative begins on the following page. |
|---|

*This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.*

US v. Jordan Holt - DEFENSE COPY

00001921

**OKLAHOMA STATE BUREAU OF INVESTIGATION**

TITLE OF REPORT:   <u>**ANALYSIS OF SHOOTING SCENE**</u>

Based upon the crime scene investigation, a review of the autopsy report, a review of the autopsy photos, and the examination of the recovered, severely deformed grey metal bullet, it is the opinion of OSBI Lieutenant BRADLEY KNIGHT that LARINTINO SCALES was shot by a fired bullet or bullet fragment that had impacted an intermediate object prior to striking SCALES in the midline forehead.  The severely deformed grey metal bullet recovered from LARINTINO SCALES' left occipital lobe was consistent with a lead or lead alloy bullet core or fragment and not an intact, fired bullet [DSC_0095].

SCALES was reported to have been standing at the driver's side (west) of the Ford LTD, four-door passenger car, with Oklahoma license plate HIQ605, that was parked along the north side of the parking lot near the west end.  There was a short pattern of at least twenty-five large and small blood-like drops on the concrete parking lot a few feet west of the driver's side, rear door of the Ford LTD.  A large pool of a blood-like substance with flow patterns toward the southeast was located several feet further southwest of the pattern of blood-like drops and the Ford LTD.

There were twenty-three "TULAMMO 7.62x39" fired cartridge cases east of SCALES' location that were found south of Apartments 801 and 803 and east/northeast of a dumpster and dumpster fence along the north side of the parking lot.  A Toyota Sienna minivan with Oklahoma license plate, JPE573, the Ford LTD, and a four-door Oldsmobile passenger car with Oklahoma license plate, FBE906, were parked west of the dumpster and dumpster fence along the north side of the parking lot from east to west.  No other rifle or handgun fired cartridge cases were located along the east to west direction of the bullet flight path toward SCALES' location.

Three bullets were fired into the Toyota Siena minivan from the east toward the west.  Two of the fired bullets were fired from a location east of the dumpster and dumpster fence.  These two fired bullets perforated the east and west sides of the dumpster fence (BD1A-B, BD2A-B), [DSC_0253-DSC_0255, DSC_0258, DSC_0259, DSC_0262-DSC_0264, DSC_0267, DSC_0269].  The two fired bullets then perforated the passenger (east) side, sliding door of the Toyota Sienna minivan (BD1C, BD2C), but did not exit the Toyota Sienna minivan.  Additional bullet defects and bullet fragments associated with flight paths of bullets that passed through the minivan door, BD1C and BD2C, were found inside the passenger compartment of the Toyota Sienna minivan.

The third bullet was fired into the passenger side (east) rear window/window opening of the Toyota Sienna minivan and was documented as bullet defect 6A (BD6A).  The

| Investigation On:  12/02/2021 | By: KNIGHT, BRAD |
|---|---|
| Date Reported: 12/29/2021 | File Number:  OSBI2019-920/50 |

This document contains neither recommendations nor conclusions of the OSBI.  It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.

**ANALYSIS OF SHOOTING SCENE**
**OSBI2019-920/50**

passenger side (east) rear window was broken with most of the glass missing from the frame [DSC_0304]. Broken glass was located on the parking lot outside the minivan and inside the minivan. The continued flight path to the west was consistent with the perforating bullet defect to the left-side C-pillar from the inside, BD6B, to the outside, BD6C [DSC_0307, DSC_0308, DSC_0309]. The defect on the interior surface of the upper C-pillar was an approximately round perforating defect of the plastic or vinyl trim (BD6B) [DSC_307]. The corresponding exit defect on the driver's (west) side of the upper C-pillar (BD6C) of the Toyota Sienna minivan was consistent with a bullet passing through the C-pillar in an east to west direction DSC_309]. The defect in the external surface of the sheet metal of the C-pillar (BD6C) exhibited stretching and shearing at the margins of the defect of the metal of the C-pillar in an outward (westward) direction. The driver's side rear window was also broken with the window glass missing from the frame. Broken glass was located on the parking lot below the driver's side rear window and inside the minivan.

Two additional bullet defects were located across the top or roof of the rear passenger compartment of the Ford LTD in an east to west direction. These two defects were long, oblique or grazing defects and indicative of a flight path parallel or almost parallel to the top of the Ford LTD. The flight paths of the grazing defects across the roof of the Ford LTD were consistent with the location of the defect (BD6C) in the C-pillar of the Toyota Sienna minivan [DSC_0311, DSC_0316]. Both grazing defects showed a lack of oxidation and/or surface residue, as well as a change of color within the defects, as apparent from a comparison to the adjacent vinyl roof material. This difference in appearance indicated that these were recent defects. The larger grazing defect, BD6D, was the wider and deeper defect and exhibited more damage to the roof of the vehicle. The damage located within BD6D consisted of scraping of the vinyl/roof material as well as stretching and tearing of the roof material [DSC_0312]. The stretching and tearing of the roof material, seen as a wake effect or artifact, indicated the direction of travel from east to west. The bullet/fragment pushed material to the west, as seen by the tears, fractures and wrinkles of the roof material. The "V" of the fractures or tears in the roof material indicated the direction of bullet flight path to the west, or conversely, the fractures or tears arced outward from the defect in a direction opposite of the bullet flight path. The east or beginning of the defect, BD6D, did not exhibit a single, uniform lead-in point or pinch point of the relatively smooth surface of the roof top of the Ford LTD [DSC_0312]. This lack of a smooth, uniform, lead-in or pinch point is consistent with an irregular shaped bullet fragment striking the roof of the Ford LTD at an oblique or shallow angle.

The defect to the frontal portion of SCALES' forehead was a perforating defect of the skin and bone with penetration into the brain [DSC_0076, DSC_0089, DSC_0095,]. The projectile, a severely deformed grey metal bullet measuring ½" x ½" x ¼", was recovered from the left occipital lobe. The beveling of bone on the interior surface of the frontal bone [DSC_0097] and the lack of an exit wound were consistent with a single, penetrating entrance wound.

**ANALYSIS OF SHOOTING SCENE**
**OSBI2019-920/50**

The penetrating defect into the midline forehead was documented by Dr. CHERYL NIBLO, Office of the Chief Medical Examiner, as an oval laceration measuring ½" x 5/16". There is concentric dried red-brown abrasion around the laceration measuring ¼". There are two purple-red contusions located inferior and to the left of the laceration measuring ½" x ½" and ½" x ¼". The oval laceration had irregular margins [DSC_0063] and appeared consistent in size and shape to the recovered, severely deformed grey metal bullet. NIBLO described the defect to the frontal bone as a circular fracture measuring ¾" x ¾". The margins of the defect in the frontal bone did not appear to be uniformly round or oval. The recovered, severely deformed grey metal bullet appeared to be approximately the size and shape of the penetrating frontal bone defect, indicating that the bullet was deformed before striking SCALES. The presence of a trace grey residue [DSC_0091] on the margins of the defect in SCALES' frontal bone was consistent with transfer of lead or lead alloy from the severely deformed grey metal bullet or bullet fragment. The severely deformed grey metal bullet or bullet fragment with thin peripheral edges appeared to not completely shear the bone ahead of the bullet upon impact, but instead transferred the lead or lead alloy from thin, flattened bullet edges to the margins of the defect in the bone upon impact and perforation of the frontal bone of the midline forehead.

The size and shape of the perforation of the skin and bone did not appear consistent with expected wounds/defects typically observed when a spin-stabilized bullet, i.e. a fired bullet from a rifled barrel, strikes a person. A bullet that is stabilized by rotation imparted to the bullet by the lands and grooves of a rifled barrel travels point forward along the flight path. Upon impact with an object, the expected defect is a uniformly round or oval defect depending upon the angle of impact to the surface of the object.

The severely deformed grey metal bullet weighed approximately 48 grains. The weight of the bullet and the lack of a jacket were not consistent with 9mm Luger ammunition commonly marketed and sold in the U.S. The majority of 9mm Luger ammunition is loaded with a jacketed projectile, whether full metal jacket bullet or some variation of a jacketed hollow point bullet. The jacket material is usually a copper or copper-zinc (brass) alloy with a core of lead or a lead-antimony alloy. The core is pressed into the jacket and the bullet jacket is formed around the lead core into a bullet. The common bullet weights for 9mm Luger ammunition are 115 grains to 147 grains. The weight of the recovered, severely deformed grey metal bullet was well below the weight of the lighter, 115 grain bullets loaded into 9mm Luger ammunition. A review of Tula 7.62x39mm ammunition marketed and sold in the U.S. indicated the availability of the following ammunition: 122 grain full jacket, 122 grain hollow point, 124 grain soft point, and 154 grain soft point ammunition.

The lack of a jacket was consistent with a fired bullet having struck an intermediate object and deformed to the extent that the integrity of the bullet was compromised. Once the bullet had been damaged, the lead alloy bullet core and the bullet jacket material would have separated. Depending upon the remaining energy and momentum retained by the bullet core and jacket, they could have continued forward along the original flight path or along slightly

**ANALYSIS OF SHOOTING SCENE**
**OSBI2019-920/50**

altered flight path(s) as separate bullet fragments.  The loss of the weight of the jacket and any additional loss of a portion of the bullet core upon fragmentation would account for the retained weight of the severely deformed grey metal bullet at approximately 48 grains.

The severely deformed grey metal bullet did not have any apparent land and groove impressions present.  The lack of any land and groove impressions would be consistent with the separation of a lead alloy bullet core from the bullet jacket.  A lead bullet fired at handgun velocity would not be expected to have the severe amount of deformation and should still exhibit land and groove impressions on at least a portion of the bearing surface of the bullet after impact with bone and tissue.  The bearing surface of a bullet is the cylindrical portion of the bullet that contacts the lands and grooves inside the rifled barrel of the firearm.

The lack of severe trauma to the brain and lack of an exit wound in SCALES' skull were not consistent with the power and energy expected or often seen of a 7.62x39mm cartridge/bullet.  The amount of trauma and lack of an exit wound were more consistent with the lesser velocity and energy associated with the more common handgun cartridges. However, the penetrating defect to the skin and bone of the midline forehead and the characteristics of the severely deformed grey metal bullet previously discussed were not consistent with a handgun bullet.

Based upon the lack of uniformly round or oval defects in the skin of the midline forehead and the frontal bone, the recovered, severely deformed grey metal bullet with no apparent rifling characteristics, and the weight of the recovered severely deformed grey metal bullet, it is not consistent that SCALES was shot with a handgun as the primary target/impact.

In conclusion, the injury to SCALES by the recovered, severely deformed grey metal bullet was consistent with a bullet core or fragment of a fired bullet that struck an intermediate object before impacting SCALES in the midline forehead.   The evidence from the scene supports the conclusion that a bullet was fired from a 7.62x39mm cartridge east of the Toyota Sienna minivan and Ford LTD near SCALES' location.  Further, evidence supports the conclusion that the fired bullet struck the Toyota Sienna minivan, perforated the driver's side C-pillar, fragmented, and a portion of the bullet core or fragment continued west over the top of the Ford LTD and struck SCALES in the midline forehead.  The characteristics of the wound to the skin and bone of SCALES' midline forehead and the severe deformation of grey metal bullet are consistent with impact by a bullet fragment and not an intact bullet. The lack of land and groove impressions on the severely deformed gray metal bullet, the lack of a jacket or jacket material or additional fragments in the wound and the weight of the recovered bullet further support the conclusion that SCALES was struck by a bullet fragment from the 7.62x39mm fired cartridge that caused the injury to SCALES' midline forehead and his death.