**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | **Case No. 21-CR-205-JFH** |
| JORDAN WAYNE HOLT, | |
| **Defendant.** | |

## <u>OPINION AND ORDER</u>

Before the Court are numerous pretrial motions filed by both the United States of America ("Government") and Defendant Jordan Wayne Holt ("Defendant"). Defendant is slated for trial on July 12, 2022, on nine charges: (1) first degree murder; (2) second degree murder; (3) voluntary manslaughter; (4) use of a firearm during a crime of violence; (5) causing the death of a person in the course of using a firearm during a crime of violence regarding Larintino Scales ("Scales"); (6) assault with intent to commit murder; (7) assault with a dangerous weapon regarding Keuntray Willis ("Willis"); (8) use of a firearm during a crime of violence regarding Willis; and (9) felon in possession of a firearm. *See* Dkt. No. 127; Dkt. No. 96.

The Government filed one motion: an omnibus motion in limine. Dkt. No. 43. Defendant filed eight motions: a motion to suppress identification evidence [Dkt. No. 45]; a motion to suppress statements [Dkt. No. 46]; a motion in limine to exclude evidence of prior dismissed conviction [Dkt. No. 47]; a motion to dismiss for spoliation of evidence [Dkt. No. 48]; a motion to exclude expert testimony [Dkt. No. 64]; an objection to the Government's Rule 404(b) notice [Dkt. No. 69]; a motion in limine to preclude the testimony of Brad Knight [Dkt. No. 116]; an amended motion to suppress identification evidence [Dkt. No. 117]; and an amended motion to dismiss for spoliation of evidence [Dkt. No. 118]. The Motion to Suppress Identification Evidence

[Dkt. No. 45] and Motion to Suppress Evidence for Spoliation of Evidence [Dkt. No. 48] are denied as moot, as they have been amended by subsequent filings [Dkt. Nos. 117 and 118].[1] The Court will address the remaining pending motions in this Order.[2]

## FACTUAL BACKGROUND

Defendant was associated with Sebastian Yanez ("Yanez") and Adrian Valdez ("Valdez") (collectively "the Yanez group"). Dkt. No. 41 at 1.[3] This group had an antagonistic relationship with another group, which included Tralyn French ("Tn. French"), Traniecia French ("Ta. French"), Lauren Hefner ("Hefner"), and Devin Johnson ("Johnson") (collectively "the French group"). *Id.* at 1-2. Scales was not associated with either group. *Id.*

### July 31, 2019 Altercation

In July 2019, Tn. French and Hefner burglarized the residence of Yanez's relative. *Id.* at 2-3. On July 31, 2019, shortly after the burglary, Yanez and Defendant used Yanez's vehicle to pursue Tn. French and Hefner at high speed. *Id.* at 3. The same day, Yanez and Defendant visited the residence of Tn. and Ta. French's relative, taking separate cars. *Id.* at 3. Depictions of what happened during this encounter vary. Hefner reported that Defendant brought a gun, "squared up with [Ta.] French 'like he wanted to fight her,'" and at some point said, "if you did take that money, your whole family better watch out…not just you." *Id.* Ta. French told two different stories of the encounter. She first told law enforcement that Defendant "got a big gun" from his vehicle and

---

[1] The Court has previously addressed the procedural and judicial economy issues presented by the parties' filings. *See* Dkt. No. 93.

[2] Defendant has requested a hearing on his pending motions. However, the Court finds that a hearing would not be helpful to the Court and, therefore, Defendant's request for a hearing on his pending motions is denied.

[3] The events leading up to the charged conduct are complex; for purposes of the current motions only, the Court accepts the Government's recitations of the facts except where noted to include additions or differences stated in Defendant's briefing.

told the group that "if they did not get the money back, he was going to shoot my momma house up." *Id.*  She later told law enforcement that she did not see a gun, but that he "popped his trunk and made her think he had a gun or weapon" and said "we going to catch y'all around." *Id.*  Cell phone recordings of the encounter exist.  *Id.*  Defendant claims Ta. French "was extremely aggressive" toward Defendant during the encounter.  Dkt. No. 69 at 5.

### August 1, 2019 Fight and Shooting

The following day, August 1, 2019, the Yanez group and the French group arrived at an apartment complex parking lot where Yanez and Tn. French planned to fight.  Dkt. No. 41 at 1.  A large crowd, including Scales, gathered to watch the fight.  *Id.*  Reports vary about whether Scales had a firearm.  *Id.*  Defendant and Valdez both brought firearms:  Valdez a revolver and Defendant a green AK-47.  *Id.*; Dkt. No. 62 at 3.  As the physical altercation escalated between Yanez and Tn. French, Ta. French and Johnson started to kick Yanez.  Dkt. No. 41 at 2.  Valdez then fired multiple rounds into the ground and Defendant, who was behind a dumpster, fired multiple rounds toward the location of the fight.  *Id.*  Defendant claims there was firing from both sides.  Dkt. No. 69 at 4. When law enforcement processed the crime scene, they recovered cartridge casings from several calibers of firearms, including 17 nine-millimeter casings.  *Id.*; Dkt. No. 41 at 2.  Valdez later told law enforcement he fired first, then Scales, then Defendant.  Dkt. No. 62 at 3.  Willis, who stood near Scales, said Scales did not have a firearm.  Dkt. No. 43 at 5; Dkt. No. 63 at 4l. Defendant later told law enforcement that four people shot firearms during the fight.  Dkt. No. 62 at 4.  After the shooting, the crowd scattered and witnesses saw Scales on the ground with a gunshot wound to his head.  Dkt. No. 41 at 2.  Scales was taken to a hospital, where he died.  *Id.*

**Witnesses to the Shooting**

Betsy Knight ("B. Knight") lived in the apartment complex where the fight and shooting occurred. Dkt. No. 62 at 5. The day of the shooting, B. Knight's daughter Deanna Garza ("Garza"), granddaughter Datoya Knight ("D. Knight"), grandson T.G., grandson Willie Cook ("Cook"), and other family members were at her apartment. *Id.* The front door of B. Knight's apartment was open at the time of the altercation. *Id.*

Garza spoke with law enforcement on the day of the shooting. She said Cook announced a fight was going to happen and "they got guns." *Id.* Garza told law enforcement that one individual in the crowd was "Jordan Holt" and that Defendant "began shooting multiple times with a rifle . . . spraying bullets," which caused a minivan's windows to break. *Id.* Garza also told law enforcement she saw an individual on the ground on the other side of the minivan after the shooting. *Id.* Garza later testified at a preliminary hearing in related state proceedings, where she said she saw a "tall, skinny black male with an AK-47 long gun" behind a dumpster. *Id.* at 5-6. She said he was the only individual she saw shooting in that direction. *Id.* at 6. According to her testimony, she saw an individual on the ground after the shooting and did not observe a firearm near him. *Id.* Garza stated during both her August 1, 2019 interview and at the state preliminary hearing that she called 911 following the shooting. Dkt. No. 63 at 7-8.

D. Knight spoke with law enforcement on the day of the shooting. Dkt. No. 62 at 6. She told an OSBI agent that she saw Defendant exit his car carrying a rifle. *Id.* She then saw multiple people discharge firearms. *Id.* The same day, she told an Idabel Police Department officer that "Jordan…I don't know his last name," who was a "black dude…real light skinned," "fired into the ground and he had a shotgun behind the trashcan" which he "raised [] and just started popping." *Id.* at 7. D. Knight wrote a brief written statement at the request of the Idabel officer, which did

not name any specific individuals.  *Id.*  D. Knight also testified at the state preliminary hearing where Garza testified.  *Id.*  She testified that she saw "Jordan" with an AK-47 during the altercation, although she "didn't see too much because [she] was trying to get [her] kids back away from the door and stuff."  *Id.*  She stated she "had difficulty seeing some of the things" but saw "Jordan" firing a long gun and "ducking…behind a green car."  *Id.* at 8.  She also saw Defendant by a dumpster holding an AK-47.  *Id.*  D. Knight claimed that most of what she knew was based on reports from her brother T.G.  *Id.*  She also claimed she had been shown a photo line-up that included Defendant and Valdez, but she could not remember when this occurred.  *Id.*

**August 2, 2019 Interview**

Defendant surrendered himself to the Idabel Police Department the day after the shooting. Dkt. No. 70 (sealed) at 2.  Two police officers, Officer Chad Dansby ("Ofc. Dansby") and Detective Anthony Aho ("Det. Aho"), escorted Defendant to an interview room.  *Id.*  Before Ofc. Dansby and Det. Aho Mirandized Defendant, Defendant stated he wanted an attorney.  *Id.* at 2. However, after stating he wanted an attorney, Defendant continued to talk to the officers and make statements about the case for approximately 14 minutes.  *Id.*  Throughout the video, the officers acknowledged Defendant's desire and right to speak with an attorney and answered both procedural and substantive questions posed by Defendant regarding the status of the victim, the investigation, and the charges against him.  Dkt. No. 70 at 2.

**Investigation and Analysis of the Shooting**

Officer Kyle Clardy ("Ofc. Clardy") of the Idabel Police Department was the first law enforcement officer to arrive on scene.  Dkt. No. 63 at 5.  Ofc. Clardy's police vehicle had a dash camera which recorded the scene.  *Id.* at 6.  Although officers apparently viewed the video at some point, the Idabel Police Department did not preserve the video and the Government does not

5

possess a copy. *Id.* Det. Aho testified in related state proceedings that he had viewed the video and that it shows Ta. French and no evidence of a firearm near Scales. *Id.* Lieutenant Johnny Voss ("Lt. Voss") of the Idabel Police Department testified at the same hearing that he was responsible for preserving dash camera footage. *Id.* Lt. Voss described a manual process of extracting videos from cameras, saving them to hard drives, and deleting them from their original removable storage, which he performed weekly. *Id.* at 6-7. Idabel Police Department had numerous problems with both the cameras themselves and this download process, which led to it choosing to discontinue use of the technology. *Id.* at 7. Lt. Voss contacted the manufacturer of the recording devices, but the manufacturer was unhelpful. *Id.*

Ofc. Dansby searched for record of a 911 call by Garza based on her statements that she called 911. Dkt. No. 63 at 8. He contacted the McCurtain County Emergency Medical Service ("EMS") and requested its 911 records for homicides from August 1, 2019, which yielded no results. *Id.* An EMS "log sheet" shows that the Idabel Police Department called regarding a gunshot wound within the relevant window, but the call came from the department's non-emergency number rather than 911. *Id.* Ofc. Dansby later stated that "it's not uncommon . . . for people to refer to calling the PD as 'calling 911' but in reality they actually called the PD number directly and not literally '911.' I've ran into this phenomenon several times over the years . . . the PD line is not recorded . . . ." *Id.*

Det. Aho of the Idabel Police Department investigated the shooting and conducted interviews with both Garza and D. Knight. Dkt. No. 62 at 8-9. He did not have a body camera on during these interviews. *Id.* He testified that he would not include two suspects in the same photo line-up in the way D. Knight described. *Id.* at 9. He reviewed the Idabel Police Department records and did not identify any facts indicating any photo line-ups had been conducted. *Id.*

A subsequent records review revealed two photo lineups that were shown to Garza and D. Knight by Idabel Police Sergeant Michael Walden ("Sgt. Walden").  Dkt. No. 123 at 7.  Sgt. Walden has stated that he believes that he would have recorded the lineups and he could not recall why he had not written a report on the lineups in this case.  *Id*. at 8.

Det. Aho also testified regarding a letter written by Hefner's cellmate, Elizabeth Seymour ("Seymour").  Dkt. No. 63 at 9.  The Seymour letter involved a description of the August 1, 2019 altercation as described by Hefner to Seymour.[4]  *Id.*  The Government produced three pages of this letter to Defendant and is not in possession of a fourth page.  *Id.*  The Government obtained the letter from the Idabel Police Department.  *Id.*  The department's copy of the letter likewise has three pages rather than four.  *Id.*  Assistant Chief Darryl Blakely ("Chief Blakely") of the Idabel Police Department also testified about the letter.  *Id.*  He stated that the copy he obtained had four pieces of paper but "had two number threes" and lacked a fourth page.  *Id.*  He testified he "looked vigorously" for a fourth page but could not find it.  *Id.*  McCurtain County District Attorney Investigator Roy Linkswiler also looked for the letter.  *Id.*  Chief Blakely stated that Seymour told him the "fourth and final page was on the back of the third page."  *Id.* at 10.

Idabel Police interviewed Hefner herself twice:  on the day of the shooting and four days later.  *Id.*  The first interview was audio and video recorded and produced by the Government to Defendant.  *Id.*  Whether the second interview was recorded is unclear.  *Id.* at 11.  Det. Aho wrote a report about the interview but did not indicate he recorded it, while Ofc. Dansby wrote a report and indicated the interview was "recorded by Aho."  *Id.*  During state proceedings, Det. Aho testified that the interview was recorded.  *Id.*  In January 2022, Ofc. Dansby wrote a statement

---

[4]  Among other things, Hefner apparently told Seymour that Hefner picked up a gun from near Scales and threw it in the woods.  Dkt. No. 63 at 10.

asserting that he "had gotten the reference to recording the interview backwards for the two reports. The portion of the interview endnote on August 5 which said the interview was recorded should have been on the endnote on the August 1 interview . . . . The August 5 interview was not recorded." *Id.* Det. Aho likewise wrote a January 2022 statement that the second interview was not recorded. *Id.* at 12. He stated he reviewed the recording devices for the interview room and did not identify any recordings of Hefner on August 5, 2019. *Id.* Any non-recording of Hefner's interview would not have violated Idabel Police Department policy, as the only interviews the department requires be recorded are those of homicide or felony sex crime suspects. *Id.*

Dr. Cheryl Niblo ("Dr. Niblo") performed an autopsy on Scales. Dkt. No. 42 at 1. She initially opined that Scales likely died from a gunshot which was fired from a small-caliber weapon within six inches of him. Dkt. No. 62 at 3. She later amended her report to say "[t]here is trace grey residue on the frontal skull" and opined that the distance between the firearm and Scales was "undetermined." *Id.* The Government filed a Rule 16 disclosure on January 14, 2022, stating that Dr. Niblo will testify as an expert witness at trial regarding "the autopsy she performed on Larintino Scales and subsequent findings and opinions in accordance with the autopsy report, amended autopsy report, and toxicology results . . . ." Dkt. No. 42 at 1 (citations omitted).

Special Agent Brad Knight of the Oklahoma State Bureau of Investigation ("OSBI") later reviewed crime scene documentation and Dr. Niblo's autopsy report. *Id.* at 4. He opined that the evidence was not consistent with a conclusion that Scales was shot with a handgun. *Id.* Instead, Agent Knight opined that the fatal bullet was fired from the other side of a minivan, perforated the vehicle, and continued past it to strike Scales. *Id.* This trajectory is consistent with Defendant's location during the fight. *Id.* The Government filed a Rule 16 disclosure on January 14, 2022, stating that Agent Knight will appear as an expert witness at trial because he "reviewed and

processed the crime scene" and will "testify to his expertise in crime scene investigation, shooting reconstruction/trajectories, and firearms." Dkt. No. 42 at 2-3.

In preparation for an evidentiary hearing in the state court matter against Valdez, Det. Aho visited the scene of August 1, 2019 shooting with Valdez's attorney. Dkt. No. 123 at 8. At the evidentiary hearing, Det. Aho testified that he recovered a bullet fragment from the dumpster but was unable to determine whether the fragment came from the August 1, 2019 shooting or another shooting in that area. *Id.*

**Defendant's Criminal History**

Defendant has multiple instances of behavior involving firearms in his past. Dkt. No. 71 (sealed) at 2-3. His juvenile history includes a 2014 "informal adjustment agreement" [Dkt. No. 71-1] and a February 2015 delinquent adjudication of reckless handling of a firearm, minor in possession of alcohol, underage DUI, and driving without a driver's license [Dkt. No. 71-3]. While still under the age of 18, Defendant was charged as an adult with and pled guilty to possession of a firearm after delinquent adjudication and knowingly concealing stolen property. Dkt. No. 71-7; McCurtain County District Court Case No. CF-2015-368.[5] Defendant received a deferred sentence. *See* Case No. CF-2015-368. The case was dismissed on April 21, 2021. *Id.*

**Victim's Criminal History**

Scales was allegedly involved in domestic altercations with an ex-girlfriend in 2013, 2014, 2015, 2017, and 2019. Dkt. No. 43 at 6. Several altercations occurred in 2019. *Id.* During one altercation, on May 30, 2019, law enforcement heard shots fired. *Id.* The officers conducted a

---

[5] The Court may take judicial notice of records from Oklahoma state courts. *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (exercising discretion "to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand"), *cert. denied*, 552 U.S. 969 (2007).

traffic stop of Scales' vehicle. *Id.* During this traffic stop, the officers located a loaded pistol magazine in the driver side floorboard. *Id.* They later found a firearm matching the cartridge size of the rounds in the magazine discarded on the side of a road. *Id.* This altercation resulted in charges against Scales of eluding a police officer, transporting an open container, and domestic assault and battery. *Id.* at 6-7. Scales was not charged with any firearms-related offenses. Dkt. No. 43 at 6-7. Neither party suggests that Defendant had knowledge of Scales' violent history. *See generally* Dkt. No. 43; Dkt. No. 66.

## AUTHORITY AND ANALYSIS

The motions before the Court fall into three main categories: motions regarding events that happened before the charged conduct; motions regarding statements made regarding the charged conduct; and motions regarding witnesses and evidence.

### I.   Motions Regarding Prior Conduct

### A.  Motion to Exclude Evidence of Defendant's Prior Criminal History [Dkt. No. 47]

Defendant requests exclusion of any reference to his now-dismissed felony conviction regarding possession of a firearm after delinquent adjudication and knowingly concealing stolen property. Dkt. No. 47. Defendant argues that the conviction is inadmissible under Federal Rule of Evidence 609(d), which bars admission of juvenile adjudications to impeach a defendant on his character for truthfulness or untruthfulness. Fed. R. Evid. 609(d). He also claims the conviction is inadmissible under Rules 401, 402, and 403 because it is irrelevant, confusing to the jury, and misleading. Dkt. No. 47 at 7-9.

The Government states it does not intend to present evidence of Defendant's juvenile or adult history as part of its case-in-chief or as impeachment regarding Defendant's character for truthfulness under Rule 609. Dkt. No. 71 (sealed) at 1. Instead, the Government asserts that evidence of Defendant's history is admissible under Rule 404(b) or Rule 613(b) "if the Defendant

opens the door via direct examination or cross-examination of any witness." *Id.* at 1-2.  Rule 404(b), as discussed in more detail *infra*, bars evidence offered to prove propensity to commit crimes but permits evidence offered for another purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  Fed. R. Evid. 404(b).  Rule 613(b) permits extrinsic evidence of a witness's prior inconsistent statement "only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."  Fed. R. Evid. 613(b).

The Government does not describe what purpose it intends to pursue by introducing Defendant's history.  It only states it "would seek to admit evidence of these firearm-related admissions and circumstances if the Defendant were to open the door" and "would seek to admit this evidence of limited purposes on an alternative theory such as Fed. R. Evid. 404(b) or 613(b), depending on the circumstances."  *Id.* at 7-8.  This is insufficient for the Court to make a pretrial determination that the evidence meets the requirements of either Rule 404(b) or Rule 613(b).[6] Should the Government intend to pursue any such evidence at trial, it is instructed to inform the Court outside the presence of the jury so the matter may be addressed in its proper context. Defendant's motion in limine to exclude evidence of Defendant's criminal history [Dkt. No. 47] is **denied without prejudice.**

### B.  Objection to Rule 404(b) Notice regarding July 31, 2019 [Dkt. No. 69]

The Government filed a notice on January 14, 2022 stating it intends to present evidence pursuant to Rule 404(b) of the July 31, 2019 altercation between the Yanez group and the French

---

[6]  The Court notes that Defendant's requested exclusion under Rule 609 is not applicable because the now-dismissed conviction was an adult criminal felony, not a juvenile adjudication.  *See* Fed. R. Evid. 609(d).

group. Dkt. No. 41. Defendant filed an objection to this notice on February 2, 2022, claiming the

evidence is irrelevant and unduly prejudicial. Dkt. No. 69.[7]

Rule 404(b) provides, in pertinent part:

> Evidence of a crime, wrong or other act is not admissible to prove a
> person's character in order to show that on a particular occasion the
> person acted in accordance with the character.
>
> …
>
> This evidence may be admissible for another purpose, such as
> proving motive, opportunity, intent, preparation, plan, knowledge,
> identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b). Courts in the Tenth Circuit begin a Rule 404(b) analysis with a determination

of whether the relevant evidence is intrinsic or extrinsic to the charged conduct, as Rule 404(b)

does not apply to intrinsic evidence. *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015)

(citing *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011)). Evidence is considered

"intrinsic" when it is inextricably intertwined with the charged conduct, meaning it is "directly

connected to the factual circumstances of the crime and provides contextual or background

information to the jury;" contrastingly, evidence is "extrinsic" when it "is extraneous and is not

connected or blended with the factual circumstances of the charged offense." *Id.* (quoting *United*

*States v. Parker,* 553 F.3d 1309, 1314 (10th Cir. 2009)). The Tenth Circuit has held that evidence

can be intrinsic even if it occurred over a period of several years prior to the charged offense. *See*

*United States v. Collins*, 97 Fed. App'x 818, 823-34 (10th Cir. 2004) (unpublished); *see also*

*United States v. Nieto Regalado*, 19-CR-0114-CVE, 2019 WL 5783730, at *11 (N.D. Okla. Nov.

---

[7] Defendant also raises a timeliness argument in his objection. While the Government's notice
was later than Defendant desired, it was before the Court's motions deadline. Defendant's
objection, however, was not filed until a day after the Court's (extended) *response* deadline. It is
Defendant's filing, not the Government's, which is untimely.

6, 2019) (holding prior acts that occurred two years prior to indicted conduct were intrinsic). Intrinsic evidence "should be approached with caution." *Collins*, 97 Fed. App'x at 824 n.7.

If the Court determines evidence is intrinsic, Rule 404(b) does not apply. However, the evidence "remains subject to the requirement of FRE 403 that its probative value is not substantially outweighed by the danger of unfair prejudice." *Irving*, 665 F.3d at 1212. If the Court determines the evidence at issue is not intrinsic, the Rule 404(b) analysis continues and the Court must consider four factors: (1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) whether the probative value of the evidence is substantially outweighed by the prejudicial effect, and (4) the availability of a limiting instruction. *Huddleston v. United States*, 485 U.S. 681, 691 (1988); *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006); *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000).

Here, the July 31, 2019 altercation is inextricably intertwined with the August 1, 2019 altercation. Both events are part of an ongoing antagonistic relationship between the Yanez group and the French group. Defendant argues that evidence of Defendant and Yanez's pursuit of Tn. French and Hefner in Yanez's car is irrelevant because Defendant did not drive the car. Dkt. No. 69 at 7.[8] This argument is not persuasive, particularly given that Defendant drove his own car to Tn. French's relative's home later the same day. Because the July 31, 2019 altercation is inextricably intertwined with the August 1, 2019 charged conduct, the evidence is intrinsic to the charged conduct and Rule 404(b) does not apply. However, the Court must still consider the Rule 403 balancing test of whether the evidence is substantially outweighed by its prejudicial effect. *See Irving*, 665 F.3d at 1212.

---

[8]   Defendant also raises various hearsay issues about testimony regarding the July 31, 2019 altercation. The proper time for hearsay objections is during trial.

Defendant claims this probative value is substantially outweighed by the prejudicial effect because the Government's evidence is "internally inconsistent." Dkt. No. 69 at 9. It is well within the jury's capability to decide what, if any, evidence to believe. "Evidence is not unfairly prejudicial simply because it is damaging to [a party's] case." *United States v. Caraway*, 534 F.3d 1290, 1301 (10th Cir. 2008) (quotation omitted). Rather, it must have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (quoting Fed. R. Evid. 403 advisory committee's note). Internal inconsistency is not sufficient to demonstrate substantial undue prejudice. Rule 403 does not require exclusion. Defendant's objection to the Government's Rule 404(b) notice filed at Dkt. No. 69 is **overruled**.[9]

## C.  Government's Omnibus Motion in Limine [Dkt. No. 43]

The Government, in compliance with the Court's scheduling order, filed an omnibus motion in limine on January 17, 2022. Dkt. No. 43. It seeks exclusion of four specific areas of evidence. *Id.*

---

[9]  The Court notes that, even if the evidence is extrinsic and Rule 404(b) applies, the result remains the same. The Government asserts that evidence of the July 31, 2019 altercation is offered for a proper purpose because it demonstrates Defendant's motive, opportunity, intent, preparation, and knowledge. Dkt. No. 41 at 6. The Court agrees. The Court also agrees that the evidence is relevant. As the Government explains in its 404(b) notice, "Defendant's threats, aggressive conduct, and vehicle pursuit one day prior to the murder . . . makes it more likely that the Defendant was again present with Yanez at the fight and was willing to enter into [the fight] on behalf of Yanez." *Id.* Additionally, the Government persuasively asserts relevancy on the basis that "evidence of the Defendant's displaying a 'big gun' on July 31, 2019 is probative of the Defendant's possession of the AK-47 on August 1, 2019." *Id.* As discussed, the probative value of the evidence is not substantially outweighed by its prejudicial effect. And, if requested, the Court would issue a limiting instruction directing the jury to consider evidence only for the proper purposes of demonstrating Defendant's motive, opportunity, intent, preparation, and knowledge. *See United States v. Nance*, 767 F.3d 1037, 1042 (10th Cir. 2014) ("[T]he probative value of this evidence . . . [is] not substantially outweighed by its potential for unfair prejudice because the Court [will], upon defen[dant's] request, instruct jurors to consider the evidence only for the limited purposes for which it [is] admitted.").

"The purpose of a motion in limine is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to the issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Mendelsohn v. Sprint/United Management Co.*, 587 F.Supp.2d 1201, 1208 (D. Kan. 2008) *aff'd,* 402 Fed. App'x 337 (10th Cir. 2010) (quotation and citation omitted).  In many instances, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in the proper context.  *Id.*  A court will generally not grant a motion *in limine* unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible on *all* potential grounds." *Tulsa Zoo Mgmt., Inc. v. Peckham Guyton Albers & Viets, Inc.*, No. 17-CV-644, 2019 WL 1562147, at *1 (N.D. Okla. Mar. 5, 2019) (citation and quotation omitted).

### 1. Self-Defense Evidence

The Government first seeks exclusion of any arguments that Defendant acted in self-defense, arguing that Defendant himself escalated the confrontation "by bringing an AK-47 to what was otherwise a fistfight."  Dkt. No. 43 at 1, 9.  The Government attributes to a 2007 Tenth Circuit decision its assertion that "[a] district court can assess the sufficiency of a defendant's affirmative defense before it is presented to a jury as part of its gate-keeping responsibilities."  *Id.* at 9 (stating it was quoting *United States v. Portillo-Vega*, 478 F.3d 1194, 1197 (10th Cir. 2007)).  This rule does not appear in *Portillo-Vega*.  *See generally* 478 F.3d 1194.  It first appeared in an out-of-circuit district court opinion citing *Portillo-Vega*.  *See United States v. Gottesfeld*, 319 F. Supp. 3d 548, 553 (D. Mass. 2018).  The actual *Portillo-Vega* decision addresses the question of whether a defendant had presented sufficient evidence to qualify for a jury instruction on an affirmative defense, not pretrial exclusion of evidence related to an affirmative defense.  478 F.3d at 1197; *see also United States v. Al-Rekabi*, 454 F.3d 1113, 1122 (10th Cir. 2006).

"A defendant's burden of production to warrant a self-defense instruction is not onerous." *United States v. Portillo-Vega*, 478 F.3d 1194, 1197 (10th Cir. 2007) (quotation omitted). "Because the government must disprove a defense of self-defense beyond a reasonable doubt, it follows that the defendant need only produce enough evidence to persuade the jury to have a reasonable doubt about whether the defendant acted in self-defense." *Id.* (citation omitted). A self-defense instruction is warranted "if the jury could have [] a reasonable doubt about whether Defendant reasonably believed he was in imminent danger of death or great bodily injury, thus necessitating an in-kind response." *Id.* (quotation omitted). Both parties acknowledge there is conflicting evidence about how the gunfire began and how many people had firearms. And when law enforcement processed the crime scene, they recovered cartridge casings from several calibers of firearms. Because of this evidence, the Government has not met its burden of showing that the evidence in question is clearly inadmissible on *all* potential grounds. *See Tulsa Zoo*, 2019 WL 1562147 at *1. The Government's motion to exclude argument that Defendant acted in self-defense is **denied**.

### 2. Victim's Specific Acts of Violence

The Government next argues that, if a self-defense argument is allowed, Defendant should be precluded from introducing Scales' domestic violence history as evidence of a violent character. Dkt. No. 43 at 10. Federal Rule of Evidence 405(b) states that "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may [] be proved by relevant specific instances of the person's conduct." Fed. R. Evid. 405(b). "[A] party may present testimony concerning specific instances of conduct only when character is in issue in the strict sense." *United States v. Talamante*, 981 F.2d 1153, 1156 (10th Cir. 1992) (quotation omitted). "Character is directly in issue in the strict sense when the existence or

nonexistence of the character trait itself determines the rights and liabilities of the parties." *United States v. Herder*, 59 Fed. App'x 257, 263-64 (10th Cir. 2003) (quoting *Perrin v. Anderson*, 784 F.2d 1040, 1045 (10th Cir. 1986)). Contrastingly, "use of evidence of a victim's violent character to prove that the victim was the aggressor is circumstantial use of character evidence." *Talamante*, 981 F.2d at 1156 (citing *Perrin*, 784 F.2d at 1045 and Fed. R. Evid. 404(a)). A victim's violent character thus does not meet the Tenth Circuit's requirements for specific instance evidence under Rule 405(b). *Id*. Evidence of specific instances of Scales' violent behavior is inadmissible under Rule 404(a)(2). *See id.*

Defendant acknowledges that Rule 404(a)(2) and Rule 405(b) prohibit evidence of specific instances of Scales' violent behavior; however, he argues, the evidence is admissible under the rule of "reverse 404(b)." Dkt. No. 66 at 12-13. The reverse 404(b) rule allows evidence of a non-defendant witness' bad acts "for defensive purposes if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him." *United States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005) (quoting *Augshi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999)). "[A]dmissibility of reverse 404(b) evidence depends on a 'straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues.'" *Id.* (quoting *United States v. Stevens*, 935 F.2d 1380, 1404-05 (3d Cir. 1991)).

Reverse 404(b) is not appropriate here. The specific instances of violent behavior briefed by the parties largely involve domestic disturbances. It is true that Scales was found with a firearm after one of these disturbances. However, neither party suggests Scales discharged the firearm during the domestic disturbance, and Scales was not charged with any firearms-related offenses in connection with those events. Any probative value of Scales' firearms possession is substantially outweighed by confusion of the issues. Scales is the decedent in a murder case. While Defendant

17

is entitled to present evidence that someone other than Defendant was the first aggressor, Defendant is not entitled to put a homicide victim on trial for specific instances of unsavory conduct in his past.  The Government's motion in limine regarding specific instances of Scales' violent conduct is **granted**.[10]

### 3. Defendant's Specific Acts of Violence

The Government next argues that, if evidence of specific instances of Scales' violent conduct is admissible, evidence of specific instances of Defendant's violent conduct is also admissible.  Dkt. No. 43 at 13.  The Court has excluded evidence of specific instances of Scales' violent conduct.  This section of the Government's motion is therefore **denied as moot**.

### 4. Defendant's Statement to Law Enforcement

The Government lastly requests the Court prohibit Defendant "from introducing or offering his own out-of-court statements to law enforcement because it is hearsay and does not fall into any exception."  Dkt. No. 43 at 14.  The Court expects both parties to comply with the Federal Rules of Evidence.  The Government may introduce Defendant's statements to law enforcement under the party-opponent exclusion from the hearsay rule.  *See* Fed. R. Evid. 801(d)(2).  No hearsay exclusion or exception applies to allow Defendant to introduce his own statements.  *See United States v. Allums*, No. 2:08-CR-30TS, 2009 WL 971279, at *1 (D. Utah Apr. 6, 2009) ("As a general rule, therefore, Defendant may not introduce his prior out-of-court statements for the truth of the matter, even to rebut other prior out-of-court statements made by him which were introduced by the government.").  This section of the Government's motion is **granted**.

---

[10]  Defendant also argues that Scales' domestic violence actions are relevant to Defendant's state of mind [Dkt. No. 66 at 16], but neither party asserts that Defendant was aware of these events.  If Defendant was not aware of Scales' behavior, it could not have affected Defendant's state of mind.

In sum, the Government's omnibus motion in limine [Dkt. No. 43] is **granted in part and denied in part**.

II.    **Motions Regarding Statements About Charged Conduct**

A.  **Motion to Suppress Defendant's Statements [Dkt. No. 46]**

The Fifth Amendment of the United States Constitution secures the individual the right against compelled self-incrimination.  U.S. CONST. AMEND. V.  In *Miranda v. Arizona,* the United States Supreme Court established procedural safeguards aimed at ensuring Fifth Amendment protections in the face of "overzealous police practices."  384 U.S. 436, 444 (1966).  Under *Miranda,* "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Id.* at 444.  Specifically, "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Id.*  Once administered, a defendant may voluntarily, knowingly, and intelligently waive his rights.  *United States v. Archuleta,* 981 F. Supp. 2d 1080, 1085 (D. Utah 2013).  A voluntary waiver is "the product of free and deliberate choice rather than intimidation, coercion or deception," and a knowing and intelligent waiver is "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine,* 475 U.S. 412, 421 (1986).  Without such a waiver, police may not continue to interrogate an individual in custody, and any confession or evidence obtained as a result of continued interrogation is inadmissible at trial.  *Miranda*, 384 U.S. at 444-45.

The Supreme Court has stated, "[a]n express waiver or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver but is not inevitably either necessary or sufficient to establish waiver."  *North Carolina v. Butler,* 441

U.S. 369, 373 (1979).  "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."  *Id.*  As succinctly stated by the Tenth Circuit, "[i]f a defendant speaks to a law enforcement officer after having been advised of his or her right to remain silent, the Government must prove by a preponderance of the evidence that the defendant's waiver of the right was voluntary.  The waiver may be inferred from the defendant's actions and words; an express waiver is not required."  *United States v. Norwood,* 194 Fed. App'x 573, 579 (10th Cir. 2006) (citations omitted).

"The ultimate issue of whether a statement was voluntary is a question of law . . . ."  *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998).  A court must consider the totality of the circumstances when determining whether a confession is voluntary, including the following non-exclusive factors:  "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment."  *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).  A court should also consider "both the characteristics of the accused and the details of the interrogation" and no single factor should be treated as conclusive.  *Id.* (quoting *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002)).

The Government states that it does not intend to introduce evidence of Defendant's statements in its case-in-chief but would seek to introduce statements as impeachment if Defendant opens the door via direct examination or cross-examination.  Dkt. No. 70 at 1.  Statements taken in violation of *Miranda* may be used for impeachment, but only if those statements have been made voluntarily.  *See United States v. Guerro*, 983 F.2d 1001, 1003 (10th Cir. 1993).  To determine voluntariness, the Court must consider the totality of the circumstances of Defendant's statements.

### i.      The Age, Intelligence, and Education of the Defendant

At the time of the statement, Defendant was 20 years old.  Dkt. No. 70-1.  Defendant demonstrated intelligence and understanding regarding the criminal justice system and his constitutional rights, as he interrupted Ofc. Dansby to request an attorney prior to being *Mirandized*.  *Id*.  Defendant went on to explain that he wanted a private, out-of-town attorney, because he was familiar with the D.A.  *Id*.

### ii.     The Length of the Detention

Defendant voluntarily turned himself in to police and was not arrested until the conclusion of the interview.  Dkt. No. 70-1.

### iii.    The Length and Nature of the Questioning

The interview was approximately fourteen (14) minutes in length.  Dkt. No. 70-1.  Most of the interview consists of Defendant making statements and asking questions about the status of the investigation and charges against him.  *Id*.  Throughout the interview, Ofc. Dansby acknowledged and confirmed Defendant's constitutional right to an attorney and assured him that he did not have to speak with the police.  *Id*.  Despite this, Defendant continued to make statements and ask questions.

### iv.    Whether Defendant was Advised of his Constitutional Rights

While Defendant was not *Mirandized* (Defendant cut off Ofc. Dansby before he was able to do so), Ofc. Dansby acknowledged and confirmed Defendant's constitutional right to an attorney and assured him that he did not have to speak with the police throughout the interview.  Dkt. No. 70-1.

### v.     Whether Defendant was Subject to Physical Punishment

Defendant voluntarily turned himself in to police and was not arrested until the conclusion

of the interview.  Dkt. No. 70-1.  He was not in handcuffs during the interview and the tone and manner of the interview was calm in nature.  *Id.*

Based upon the totality of the circumstances of the interview, the Court finds that Defendant's statements were voluntarily made and, therefore, may be used for the limited purpose of impeachment if Defendant opens the door via direct examination or cross-examination.  If the Government believes Defendant has opened the door, the Government is instructed to inform the Court outside the presence of the jury, so the matter be addressed properly prior to introduction.  Accordingly, Defendant's Motion to Suppress Defendant's Statements [Dkt. No. 46] is **denied**.

### B.  Motion to Suppress Identification Evidence [Dkt. No. 117]

Defendant seeks exclusion of Garza's testimony and D. Knight's testimony because "the identifications were unreliable" in violation of due process and evidentiary rules.  Dkt. No. 117 at 2.  Defendant claims both Garza and D. Knight relied on information provided by their family member, T.G., instead of on their own personal knowledge.  *Id.*  Defendant also claims that the photo lineup of Defendant and D. Knight's in-court identification of Defendant during a previous state hearing were "so unnecessarily and impermissibly suggestive as to give rise to substantial likelihood of misidentification" and tainted identification.  *Id.* at 7.

The Court will first examine the constitutional argument.  Courts may conduct "a due process check on the admission of eyewitness identification . . . when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime."  *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).[11]  "[D]ue process concerns arise only

---

[11]  The Court notes that Defendant did not cite *Perry* in his motion, instead only citing Supreme Court decisions from the 1960s and 1970s.  Counsel is reminded of the obligation under Model Rule of Professional Conduct 3.3 that while lawyers are "not required to make a disinterested exposition of the law, [they] must recognize the existence of pertinent legal authorities."

when law enforcement officers use an identification procedure that is both suggestive and unnecessary," and even then, exclusion is not automatic. *Id.* at 238-39. Instead, courts must "assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification" based on the totality of the circumstances. *Id.* at 239 (quotation omitted). The Tenth Circuit has extended *Perry* to both in-court and out-of-court identifications. *United States v. Thomas*, 849 F.3d 906 (10th Cir. 2017).

The Court does not believe the circumstances surrounding Garza's and D. Knight's identifications were manufactured by law enforcement to be both suggestive and unnecessary. Defendant does not identify unduly persuasive pressure by any law enforcement officers. Indeed, Defendant himself says Garza and D. Knight "[relied] on T.G.'s purported knowledge of the individuals" to give their statements, not on pressure exerted by law enforcement. Dkt. No. 117 at 2. The question of whether Garza and D. Knight relied on someone else's recitation rather than personal knowledge is a hearsay question, not a constitutional question. Regarding the photo lineup, both Garza and D. Knight identified Defendant prior to the photo lineup. Dkt. No. 120 at 15. While Defendant questions Garza's and D. Knight's familiarity with Defendant prior to the shooting, Defendant may explore this through cross-examination at trial. Finally, D. Knight's identification of Defendant during prior state proceedings does not have anything unduly concerning about it, as "[o]f course, it is customary for defendants to sit at counsel table." *Thomas*, 849 F.3d at 911. Considering the totality of the circumstances, the Court does not believe improper police conduct created a substantial likelihood of misidentification.

The Court next examines Defendant's evidentiary argument. Dkt. No. 117 at 9. It is the jury's task—not the Court's—to assess witnesses' credibility and reliability, including the reliability of identification testimony. *See Pavatt v. Carpenter*, 928 F.3d 906, 922 (10th Cir. 2019)

(citing *Perry*, 565 U.S. at 252 (Sotomayor, J., dissenting)).   Cross-examination may "amply expose[]" any "common-sense deficiencies in the prosecution's identification case." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1126 (10th Cir. 2006).   For the reasons stated, Defendant's amended motion to suppress identification evidence filed at Dkt No. 117 is **denied**.

## III.   Motions Regarding Witnesses and Evidence

### A.   Motion to Dismiss for Spoliation of Evidence [Dkt. No. 118]

A spoliation allegation involves "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Because the evidence implicated here is not in the Government's possession, two Supreme Court cases govern the Court's analysis: *California v. Trombetta*, 467 U.S. 479, 486 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).   *See Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994) ("The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes.   *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] and its progeny address exculpatory evidence still in the [G]overnment's possession.   *Youngblood* and [*Trombetta*] govern cases in which the [G]overnment no longer possesses the disputed evidence.").

> Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." The Court in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence.

*United States v. Bohl*, 25 F.3d 904, 909-10 (10th Cir. 1994) (citations omitted).   Defendant bears the burden of demonstrating bad faith under *Youngblood*.   *Id.* at 913 (citing *United States v. Donaldson*, 915 F.2d 612, 614 (10th Cir. 1990).

For each piece of evidence, the Court must first determine whether its exculpatory significance was "apparent" or only "potential."  If apparent, the Court will apply *Trombetta* and determine whether the Defendant could obtain comparable evidence by other means.  If potential, the Court will apply *Youngblood* and determine whether the Defendant has demonstrated bad faith by the Government.

### 1.   Clardy Dash Cam

Defendant argues Ofc. Clardy's dash cam footage is "inherent[ly] exculpatory" because video of "the totality of the scene, which include[d] multiple spent casings of varying caliber, the large, gathered crowd, and the position of [Ofc.] Clardy's patrol vehicle . . . would assist in identifying additional witnesses and additional shooters, corroborating [Defendant's] defense." Dkt. No. 118 at 8.  Defendant claims the video's exculpatory value was apparent before destruction because Tn. French and Valdez "told [officers] the decedent was armed and firing in their direction" and officers "were told several times that the decedent fired first."  *Id.*  Additionally, Defendant claims the exculpatory value was apparent to law enforcement before destruction because the "video would contain evidence of who was [on scene] and if any individuals in the crowd disturbed the scene by picking up a gun while the officers attended to the injured."  *Id.*  at 8-9.  The Government responds that this argument is speculative, does not demonstrate that the video was exculpatory, and does not demonstrate that any exculpatory value was apparent at the time of destruction.  Dkt. No. 123 at 12-13.  The Court agrees with the Government.

Defendant's argument that the dash cam footage would have shown an "armed and firing" Scales is not persuasive, as neither party claims that Ofc. Clardy was on scene during the shooting; rather, he was apparently the first law enforcement officer to respond after the shooting had ended. Defendant's argument that the video would show "*if* any individuals in the crowd disturbed the

scene" is pure speculation, which rises at most to an argument of potential—not apparent—exculpatory value. *Youngblood*, not *Trombetta*, applies.[12]

Defendant has not demonstrated bad faith by the Government. Defendant cites one Ninth Circuit case "finding bad faith where the destroyed evidence's value as potentially exculpatory was repeatedly suggested to government agents." Dkt. No. 118 at 8 (citing *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)). In *Cooper*, the defendant repeatedly informed the Government that the evidence at issue was unique and the Government repeatedly told the defendant and his counsel that the evidence was being held, even after it had been destroyed. 983 F.2d at 931. No such situation exists here. The Government describes in its response how Idabel is a rural Oklahoma police department with a less-than-cutting-edge file storage system. *See* Dkt. No. 123 at 3-4. While its technology certainly leaves something to be desired, the Court finds nothing to suggest purposeful destruction of evidence. "Mere negligence on the [G]overnment's part in failing to preserve [] evidence is inadequate for a showing of bad faith." *United States v. Parker*, 72 F.3d 1444, 1451 (10th Cir. 1995) (quoting *Bohl*, 25 F.3d at 912)).

### 2. Garza Emergency Call

Defendant next argues that the 911 call allegedly made by Garza is missing and had exculpatory value apparent at the time of destruction because "[i]t is likely that the 911 caller identified how many individuals were shooting" and "responding police officers would have known the importance of the 911 call in identifying the number of shooters, corroborating Mr. Holt's defense." Dkt. No. 118 at 9. The Government argues that no evidence was destroyed because no call was recorded. The Government details several investigatory steps taken to identify

---

[12]   Additionally, even if *Trombetta* applied, the Government cites multiple sources of other comparable evidence regarding the crime scene, including numerous police reports documenting the scene and recorded statements from eyewitnesses. Dkt. No. 123 at 13.

any recordings and cited an officer's testimony that it was not uncommon for citizens to call the police line rather than 911. Dkt. No. 123 at 5. The police line is not recorded. *Id*. Defendant has not demonstrated that this piece of evidence existed, let alone that the Government destroyed it despite apparent value.

### 3. Seymour Letter

Defendant argues that Seymour's letter has apparent exculpatory value because the letter described Hefner's account of disposing of a firearm that was allegedly near Scales' body after the shooting. Dkt. No. 118 at 9-10. Neither party asserts that Seymour was present at the shooting. Instead, Seymour was Hefner's cellmate at some point after the shooting. Defendant freely admits that the letter recites what Hefner told Seymour, not Seymour's personal knowledge. *Id*.

Defendant again does not carry his burden of demonstrating that the letter had apparent exculpatory value. The section of the letter that is in the Government's and Defendant's possession does not use names. It does not state that Scales fired a gun during the shooting. It does not state that Defendant acted in self-defense. In short, the letter's exculpatory value is "far from apparent." *See Parker*, 72 F.3d at 1451. And, as with the other evidence discussed so far, Defendant has not demonstrated bad faith at any point in the letter's chain of custody.[13]

### 4. Video and Report of Photo Lineup

The Idabel Police Department located two photo lineups that were shown to T.G. and D. Knight by Idabel Police Sergeant Michael Walden ("Sgt. Walden"). Dkt. No. 123 at 7. Sgt. Walden has stated that he believes that he would have recorded the lineups and he could not recall

---

[13] Again, even if the value were apparent and *Trombetta* applied, comparable evidence is available. Defendant possesses a recorded interview of Seymour where she states the same things she writes in her letter. Dkt. No. 123 at 15. And Defendant may call Seymour for live testimony at trial. The Court notes, however, that hearsay issues remain with Seymour's testimony regardless of its form.

why he had not written a report on the lineups in this case. *Id.* at 8. The Idabel Police Department has not been able to locate any video. *Id.* Defendant argues that the video recording and report regarding a photo lineup shown to T.G. and D. Knight "are crucial in that they show the circumstances of the identification procedure." Dkt. No. 118 at 10.

Both T.G. and D. Knight identified the Defendant at the scene prior to being shown the photo lineup. Dkt. No. 123 at 15. Additionally, the photo lineup is inculpatory in nature, in that both T.G. and D. Knight circled Defendant's picture and noted that he had and used a gun at the scene. *Id.* The Court agrees with the Government that Defendant's assertion regarding the exculpatory nature of the video and report is merely speculative, which rises at most to an argument of potential—not apparent—exculpatory value. *Youngblood*, not *Trombetta*, applies.[14]

Defendant has not demonstrated bad faith by the Government. Defendant does not allege that the video or report were destroyed, but simply that the items "cannot be located." Dkt. No. 118 at 10. "Mere negligence on the [G]overnment's part in failing to preserve [] evidence is inadequate for a showing of bad faith." *United States v. Parker*, 72 F.3d 1444, 1451 (10th Cir. 1995) (quoting *Bohl*, 25 F.3d at 912)).

### 5. Bullet Fragment

Defendant argues that a bullet fragment recovered at the scene of the shooting is exculpatory because it was found in the dumpster wall which would show that the bullet "had been shot in an easterly direction, toward Mr. Holt and Mr. Valdez." Dkt. No. 118 at 10. Det. Aho testified at an evidentiary hearing in the state court matter against Valzez that he recovered a bullet fragment at the scene of the shooting, <u>five (5) months later</u>, but could not say whether it came from

---

[14] Even if *Trombetta* applied, Defendant may inquire into the circumstances of the identification procedure by cross-examination.

the August 1, 2019 shooting, or some other shooting in the area.  Dkt. No. 123 at 8.  For this reason, the bullet fragment was not maintained.  *Id*.  Defendant provides no evidence which would link the bullet fragment to the shooting in this matter and, therefore, fails to show its exculpatory value.

In sum, none of Defendant's arguments provide a basis for dismissal of the second superseding indictment.  Defendant's motion to dismiss for spoliation of evidence filed at Dkt. No. 118 is **denied**.

### B.  Motion to Exclude Expert Testimony [Dkt. Nos. 64, 116]

The Government filed a notice of intent to offer expert witness testimony on January 14, 2022.  Dkt. No. 42.  The notice includes four expert witnesses:  medical examiner Dr. Niblo; criminalist Katelyn Millar; criminalist Barbara Wells ("Wells"); and OSBI Agent Knight.  *Id*. Defendant seeks exclusion of Wells' and Agent Knight's testimony.  Dkt. No. 64.  Defendant further filed a Motion in Limine to Preclude the Testimony of Brad Knight ("Motion in Limine"). Dkt. No. 116.

The Court will first address Defendant's Motion in Limine.  Dkt. No. 116.  Defendant's Motion in Limine is nearly identical to Defendant's Motion to Exclude Expert Testimony [Dkt. No. 64], but for the following differences: (1) the Motion in Limine requests the "preclusion," rather than the exclusion, of Agent Knight's testimony; (2) the Motion in Limine is silent as to Barabara Well's testimony; and (3) the Motion in Limine addresses arguments raised by the Government in its response to Defendant's Motion to Exclude Expert Testimony [Dkt. No. 78]. *Id*.  The Court therefore construes Defendant's Motion in Limine [Dkt. No. 116] as a reply to the Government's response [Dkt. No. 78].  Pursuant to LCvR 7.1(e), "[r]eply briefs regarding new

matters in the response brief may be filed within fourteen (14) days, after the response is filed."[15]
The Government filed its response brief on February 1, 2022.  Dkt. No. 78.  Defendant's Motion
in Limine was filed 115 days later and is grossly out of time.  Dkt. No. 116.  For this reason,
Defendant's Motion in Limine [Dkt. No. 116] is **denied**.  The Court will now address the Motion
to Exclude Expert Testimony [Dkt. No. 64].

### 1.  Rule 16

Defendant first seeks exclusion under Rule 16, which governs expert disclosures in
criminal cases.  Dkt. No. 64 at 8-13.  Federal Rule of Criminal Procedure 16(a)(1)(G) requires that,
at a defendant's request, the Government "must give to the defendant a written summary of any
testimony that [it] tends to use" under the Federal Rules of Evidence concerning expert opinions.
Fed. R. Crim. P. 16(a)(1)(G).  "The summary provided . . . must describe the witness's [sic]
opinions, the bases and reasons for those opinions, and the witness's [sic] qualifications."  *Id.*

Rule 16's "required 'written summary' [in a criminal case] falls far short of the 'complete
statement' required of litigants in civil cases."  *United States v. Nacchio*, 555 F.3d 1234, 1262
(10th Cir. 2009) (en banc) (McConnell, J., dissenting).  "In particular, Rule 16 does not require
experts in criminal cases to provide written reports explaining their opinions or to make a written
proffer containing the information required under the civil rules."  *Id.*  "Exclusion of [a] witness[']
expert testimony [for a Rule 16 violation] is almost never imposed in the absence of a constitutional
violation or statutory authority for such exclusion."  *United States v. Charley*, 189 F.3d 1251, 1262
(10th Cir. 1999).

---

[15]  Pursuant to Local Criminal Rule 1.2, "[w]hen appropriate in a criminal context, the Local Rules
of Civil Procedure are also deemed applicable to criminal cases."  Because the Local Criminal
Rules are silent regarding replies, the Court applies the Local Rules of Civil Procedure.  The Court
further notes that reply briefs are limited to ten (10) pages in length unless otherwise authorized
by the Court. See LCvR 7.1(e).

Defendant has not shown a constitutional violation or statutory authority for exclusion of Wells' or Agent Knight's testimony and opinions under Rule 16. All Rule 16 requires is that, upon request from a defendant, the Government must provide a written summary with "a description of the witness's [sic] opinions, the bases and reasons for those opinions, and the witness's [sic] qualifications." Fed. R. Crim. P. 16(a)(1)(G). The notice filed by the Government at Dkt. No. 42 satisfies Rule 16, and the Court does not find its timing to be prejudicial.

### 2. *Daubert*

Admissibility of expert witness testimony is evaluated under Federal Rule of Evidence 702, which permits a qualified expert witness to testify and render an opinion when:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "When an objection to an expert's testimony is raised, the court must perform *Daubert* gatekeeper duties before the jury is permitted to hear the evidence." *Bright v. Ohio Nat'l Life Assur. Corp.*, 11-CV-475, 2013 WL 12327512, at *1 (N.D. Okla. Jan. 9, 2013) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999)).

"First, the Court determines whether the expert is qualified by knowledge, skill, experience, training or education to render the opinion." *Lippe v. Howard*. 287 F. Supp. 3d 1271, 1277-78 (W.D. Okla. 2018). "If so qualified, the Court must then determine whether the expert's opinion is reliable and relevant under the principles set forth in *Daubert* and *Kumho Tire*, in that it will assist the trier of fact." *Id.* at 1278. The party offering the expert testimony has the burden

to prove that the expert is qualified and that his opinions are based in sound methodology and sufficient facts. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

The first step in the *Daubert* inquiry is to determine whether a witness is qualified by knowledge, skill, experience, training, or education to render an opinion. *Lippe*, 287 F.Supp.3d at 1277-78. An expert's qualifications must provide "a foundation for a witness to answer a specific question." *Id.* at 1279 (quotation and citation omitted). An expert's qualifications must be both "(i) adequate in general, qualitative sense (i.e., knowledge, skill, experience, training, or education as required by Rule 702) and (ii) specific in the matters he proposes to address as an expert." *Id.* An expert cannot provide an opinion regarding matters on which his background and training do not provide a proper foundation. *See English v. Estes Express Lines*, No. 14-CV-70, 2018 WL 1136058, at *6 (C.D. Cal. Feb. 15, 2018).

After concluding a witness is qualified as an expert, the Court must evaluate whether his opinion is relevant and reliable. *Lippe*, 287 F. Supp. 3d at 1278. Evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotations and citations omitted). "The 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact." *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002).

The Court next considers whether the evidence is reliable. In making the reliability determination, the Court must focus on "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The Tenth Circuit has cited four factors that district courts should apply to make a reliability determination:

> (1) Whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and

publication; (3) whether there are known potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 593-94). *Daubert* recognizes that these factors are not a "definitive checklist." *Daubert,* 509 U.S. at 593; *Kumho Tire Co.*, 526 U.S. at 150-51. A trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152. Whether another court has accepted a methodology is relevant in determining whether expert testimony is reliable. *Tyson Foods*, 565 F.3d at 780. An expert witness may rely on his or her experience in that field if the witness "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis of the opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note (2000 amendment)).

The Court initially notes that much of Defendant's *Daubert* challenge reiterates Defendant's Rule 16 arguments, criticizing the substance of the reports written by Wells and Agent Knight which were produced during discovery. *See generally* Dkt. No. 64. The Court notes that the expert reports in this case are hearsay and shall not be presented to the jury. *See Navajo Nation Hum. Rts. Comm'n v. San Juan Cty.*, 281 F. Supp. 3d 1136, 1162 (D. Utah 2017) (collecting cases) (explaining expert reports are generally inadmissible at trial because they represent out of court declarations offered for their truth). To the extent that Defendant challenges the completeness of the reports as far as things such as "the manner in which [DNA] testing was conducted" [Dkt. No. 64 at 19], this topic is well-suited for cross-examination at trial. Nevertheless, the Court continues its *Daubert* analysis as it must under its gatekeeping responsibilities.

### a.  Wells

Defendant does not challenge Wells' credentials as a criminalist or the relevance of DNA analysis. Dkt. No. 64 at 18-19. He challenges the methodology of her DNA analysis, which is only briefly stated in her report. *Id.* The Court is not particularly concerned with the contents of Wells' report itself, since the report is hearsay and was not required to have been produced to Defendant under Rule 16. However, the Court will continue the *Daubert* analysis in anticipation of Wells' testimony at trial.

Defendant argues the polymerase chain reaction ("PCR") method Wells employed to analyze DNA found at the scene is unreliable. Dkt. No. 64 at 19. On the contrary, "[n]umerous federal and state courts as well as scientific investigators have found that PCR DNA analysis is reliable." *Wilson v. Sirmons*, 536 F.3d 1064, 1102 (10th Cir. 2008) (collecting cases). "PCR analysis 'has received overwhelming acceptance in the scientific community and the courts.'" *Id.* (quoting George Bundy Smith & Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Courts*, 65 Fordham L. Rev. 2465, 2470 (1997)). As the Government notes in its response to Defendant's *Daubert* motion, Defendant's citation to a 2009 Tenth Circuit case is inapposite because it involved application of PCR analysis in a "novel and untested manner." *See Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). Nothing suggests Wells applied PCR analysis in an unusual or pioneering way. PCR DNA has been admissible in courts for more than 25 years. *See Wilson*, 56 F.3d at 1102. It is admissible in this case as well.

### b. Agent Knight

Defendant claims the Government has not established that Agent Knight has sufficient qualifications to testify as an expert and claims the Government has failed to provide information regarding Agent Knight's methods and their indicia of reliability. Dkt. No. 64 at 17-18.

Defendant first challenges Agent Knight's qualifications.  He believes Agent Knight will discuss "a bullet's entrance into the decedent's body, damage caused, and other topics suited for a qualified forensic pathologist" and argues that no evidence establishes Agent Knight "is a forensic pathologist or has the technical knowledge to opine about physiological matters like entry wounds, beveling of bone, biological deformities and perforations, brain and skin trauma, and other topics." *Id.* at 18.  The Government responds that Agent Knight is offered as "an expert in crime scene investigation, shooting reconstruction/trajectories, and firearms," not forensic pathology.  Dkt. No. 78 at 11.  Agent Knight has a number of certifications, including a 2020 certification as an International Association for Identification Certified Crime Scene Analyst and a 2016 certification as an International Association for Identification Certified Crime Scene Investigator.  *Id.* at 12. Presumably, reconstructing a bullet trajectory involves some analysis of the physiological evidence left by that bullet.  The Court concludes Agent Knight is qualified to opine as an expert on crime scene investigations, including on the general reconstruction of bullet trajectories.

Defendant next challenges Agent Knight's methodology, claiming it cannot tell whether "there is any indicia of reliability undergirding [his] crime scene diagram and measurements" or whether "the methods [he] used would be accepted by experts in the field of crime scene investigation." Dkt. No. 64 at 17.[16]  The Government responds that "Agent Knight's analysis is based on mapping, trajectory analysis, mathematical measurement and other processes that are standard in his field." Dkt. No. 78 at 13.  Much of the Government's response summarizes Agent Knight's report rather than describing his methodology, which does not provide the Court much in regard to the *Daubert* factors.  *Id.*  However, "the reliability criteria enunciated in Daubert are not to be applied woodenly in all circumstances."  *United States v. Garza*, 566 F.3d 1194, 1199

---

[16]  Defendant does not challenge the relevance of Agent Knight's testimony.

(10th Cir. 2009).  The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co.*, 526 U.S. at 152.  OSBI is one of the main investigative bureaus in Oklahoma.  Agent Knight has numerous qualifications.  This is sufficient for the Court to conclude that Agent Knight's anticipated testimony has sufficient indicia of reliability to be presented to the jury.  Defendant may, of course, cross-examine Agent Knight on his methods.

Defendant's motion to exclude expert testimony filed at Dkt. No. 64 is **denied**.

## CONCLUSION

**IT IS THEREFORE ORDERED** that:

- Defendant's motion in limine to exclude evidence of Defendant's criminal history filed at Dkt. No. 47 is **denied without prejudice.**

- Defendant's objection to the Government's Rule 404(b) notice filed at Dkt. No. 69 is **overruled**.

- The Government's omnibus motion in limine filed at Dkt. No. 43 is **granted in part and denied in part**.

- Defendant's motion to suppress statements filed at Dkt. No. 46 is **denied**.

- Defendant's motion to suppress identification evidence filed at Dkt No. 45 is **denied as moot**.

- Defendant's motion to dismiss for spoliation of evidence filed at Dkt. No. 48 is **denied as moot**.

- Defendant's motion to exclude expert testimony filed at Dkt. No. 64 is **denied**.

- Defendant's motion in limine to preclude the testimony of Brad Knight filed at Dkt. No. 116 is **denied**.

- Defendant's amended motion to suppress identification evidence filed at Dkt. No. 117 is **denied**.

- Defendant's amended motion to dismiss filed at Dkt. No. 118 is **denied**.

DATED this 13th of June 2022.

_____

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE